**Patrick M. Griffin [SBN 276171]**
Griffin Law Office, APC
1350 Columbia St., Suite 401
San Diego, CA 92101
Telephone: (619) 269-2131
Email: patrick@griffinlawoffice.com

Attorney for Defendant
DOUGLAS JAMES WIEDERHOLD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DOUGLAS JAMES WIEDERHOLD,<br><br>Defendant. | Case No.: 23-cr-01202-JLS<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>Hon. Janis L. Sammartino<br>Courtroom 4D<br>Date: January 30, 2026<br>Time: 9:00 a.m. |

## I.
## STATEMENT OF THE CASE

This case is before the Court for sentencing nearly fifteen years after the conduct at issue and more than four years after the government charged the principal GirlsDoPorn conspiracy. The government brought the original conspiracy case against Michael Pratt and the other core defendants in 2019. Mr. Wiederhold was not charged as part of that prosecution and was not charged until 2023, based on conduct alleged to have occurred years earlier.

Mr. Wiederhold entered a guilty plea on April 11, 2024, to Count One of the Information, a violation of 18 U.S.C. § 371, conspiracy to commit an offense against the United States, to wit, 18 U.S.C. § 1591(a)(1) and (2). He has been on pretrial supervision for approximately 29 months, and has remained fully compliant with all conditions.

**The defense respectfully requests a sentence of 12 months of home confinement.**

## II.
## <u>THE INDIVIDUAL BEFORE THE COURT</u>

Douglas Wiederhold is not defined by the narrow window of conduct that brings him before the Court today. He grew up in a lower-middle-class family in Michigan, worked from a young age, and developed an early sense of responsibility and independence. His life took a profound turn in early adulthood when his younger brother Andrew, his closest friend and constant companion, was killed in a motorcycle accident. Mr. Wiederhold has described that loss as "beyond trauma" (PSR ¶¶ 96–98).



*Mr. Wiederhold (left) with his late brother, Andrew.*

That loss marked a destabilizing period in his life. Family members describe a young man struggling with grief and the sudden absence of structure at a time when he was still finding his footing. His stepmother explains that even while grappling with his own loss, Doug "helped the rest of us through ours," spending time supporting his father and siblings and creating traditions to honor his brother's memory (Exhibit B, Letter of Diane Wiederhold). But those efforts did not insulate him from the effects of grief on his own judgment and direction.

The person before the Court today bears little resemblance to that version of himself. For approximately fifteen years, Mr. Wiederhold has lived a law-abiding life. He has no criminal history, juvenile or adult (PSR ¶¶ 41–42). He has not been arrested, charged, or accused of any misconduct during that entire period. That sustained record of lawful behavior is not incidental. It is central to understanding who he is now.



*Mr. Wiederhold (left to right) with his partner, Margo; his stepmother, Diane; and his father, James.*

Those who know him consistently describe a man defined by calm, empathy, and integrity. A former colleague recounts observing Doug de-escalate volatile situations and ensure the safety of others, noting that he was "always empathetic and adept at de-escalating confrontational situations" (Exhibit B, Letter of Nathan Stevens). Another described him as "intelligent and success-oriented," someone who "always displayed high integrity" and treated everyone with professionalism and respect (Exhibit B, Letter of Tamela Seehase).

Multiple letters emphasize Doug's role as a steady and positive influence in the lives of others. One writer stated, "I cannot overstate Doug's impact on my life. He is the reason I am in the health and fitness industry today," attributing his own career path and commitment to helping others directly to Doug's mentorship and example (Exhibit B, Letter of Nathan Stevens). These accounts describe a consistent pattern of conduct over many years, not isolated acts of kindness.

After separating himself from Michael Pratt, Mr. Wiederhold continued working in the adult industry, but did so lawfully, transparently, and without incident. There is no allegation, evidence, or suggestion of deception, coercion, or unlawful conduct during that period (PSR ¶¶ 102–108). The record reflects that the misconduct in this case was not a function of the industry itself, but of Pratt's deception and control. Once Mr. Wiederhold was no longer operating under Pratt's influence, the problems stopped. The absence of complaints, investigations, or charges over approximately fifteen years underscores that distinction.

Today, Mr. Wiederhold lives a quiet and stable life in northern Michigan with his longtime partner, Margo Dean, and their dogs. He focuses on health, outdoor living, and building a sustainable future. He and Ms. Dean are planning a small retreat or campground space grounded in nature, wellness, and community (Exhibit B, Letter of Margo Dean).



*Mr. Wiederhold with his partner, Margo.*

In his apology letter to the Court, Mr. Wiederhold accepts responsibility for his conduct and expresses genuine remorse for the harm suffered by the victims. He reflects on how grief, immaturity, and manipulation affected his judgment at the time, and how time, distance, and reflection have changed him. The letter reflects insight and accountability, not excuse-making (Exhibit A, Letter of Douglas Wiederhold).

The Court is asked to sentence the person Mr. Wiederhold is today, not the young man he was during a period of grief and instability nearly fifteen years ago. The record shows sustained rehabilitation, lawful conduct, and a life oriented toward responsibility long before the government ever chose to charge him. That history deserves significant weight.

## III.
## STATEMENT OF THE FACTS

There is no dispute that the GirlsDoPorn enterprise caused profound and lasting harm. The women involved were deceived, exploited, and suffered real personal, professional, and emotional consequences. Many have described the

damage to their lives as permanent. That harm is real, and nothing in this memorandum is intended to diminish it.

At the same time, sentencing requires an individualized assessment grounded in accurate facts. The GirlsDoPorn operation did not appear fully formed. It evolved over time, and the culpability of those associated with it varies significantly depending on when they became involved, what they knew, and what choices were realistically available to them at the time. Mr. Wiederhold stands apart from every other defendant sentenced in connection with this case, and understanding how and why requires careful attention to the chronology.

### A. How Mr. Wiederhold Came Under Michael Pratt's Control.

Mr. Wiederhold did not seek out a criminal enterprise. He answered an online advertisement, performed in a small number of shoots, and then did not hear from Michael Pratt for a period of time. At that point in his life, Mr. Wiederhold was living in Ohio and attempting to build an independent photography business. He was booking weddings, developing a client base, and trying to establish himself professionally.

Mr. Wiederhold was also financially unstable. When Mr. Pratt reentered his life, he did so by exploiting that instability. Mr. Pratt flew Mr. Wiederhold to San Diego under the promise that he would also fly him back so that Mr. Wiederhold could meet his photography commitments in Ohio. Mr. Pratt did not follow through on that promise. As a result, Mr. Wiederhold lost his booked photography jobs, was forced to refund clients, and found himself stranded in San Diego without income or resources. From that moment forward, Mr. Wiederhold was economically and logistically dependent on Mr. Pratt.

This dependency was not incidental. It defined the relationship that followed. Mr. Pratt controlled Mr. Wiederhold's housing, transportation, work opportunities, and income. Mr. Pratt routinely made promises to Mr. Wiederhold that he did not keep. He would suggest future work, travel, or compensation, only to withhold it later. Mr. Wiederhold was left seeking scraps of work and approval from the same person who controlled whether he could remain housed and employed.

This dynamic matters. It explains why Mr. Wiederhold remained in an environment he did not create, did not control, and did not fully understand at the outset.

### B. What Mr. Pratt Told Mr. Wiederhold, and What Mr. Wiederhold Believed at the Time.

Michael Pratt was Mr. Wiederhold's boss. He controlled the shoots, the contracts, the logistics, and the information flow. Mr. Pratt repeatedly told Mr. Wiederhold that the women had signed contracts explicitly authorizing the use of the videos. Mr. Pratt emphasized that the paperwork gave him the right to do what he wanted with the content. Mr. Pratt also told Mr. Wiederhold that because of his Australian residency and tourist visa status, everything had to be routed through an Australian company, and that representations about overseas distribution were part of that structure.

In hindsight, those representations are plainly false. At the time, they were delivered by someone who appeared to be running a legitimate business, who controlled Mr. Wiederhold's livelihood, and who was convincing in how he explained what was happening. Mr. Wiederhold did not have access to backend information, posting decisions, or distribution channels. He was told what he needed to know to perform, and nothing more.

This does not excuse Mr. Wiederhold's conduct. It explains how he understood it at the time.

### C. Mr. Wiederhold's Role During the Shoots and the Reality of Pratt's Control.

By the time Mr. Wiederhold became involved in additional shoots, Michael Pratt was not simply an employer in the abstract. He was a controlling boss who exercised power over far more than a job. Pratt controlled Mr. Wiederhold's housing, transportation, income, and continued ability to remain in San Diego. Mr. Wiederhold did not have independent resources, leverage, or alternatives. His ability to eat, sleep, and work depended on staying in Pratt's good graces.

This dynamic matters when evaluating Mr. Wiederhold's conduct. Pratt was not a peer. He was the person who controlled Mr. Wiederhold. In that environment, Mr. Wiederhold was expected to follow instructions, not question them. Insubordination carried real consequences, including loss of housing and income.

The investigation supports a critical and consistent fact: Mr. Wiederhold was not part of the substantive discussions with the women about contracts, distribution, or assurances. Pratt handled recruitment. Pratt handled contracts. Pratt spoke to the women. During those discussions, Mr. Wiederhold was typically elsewhere preparing for the shoot. This was not incidental. It reflected the hierarchy Pratt created and enforced.

That same hierarchy explains the limited role Mr. Wiederhold played with respect to drugs and alcohol. As detailed in the PSR objections, witnesses consistently described Pratt as the person offering alcohol, controlling access, or directing what could be charged to rooms. In some instances, Mr. Wiederhold was present while alcohol or marijuana was already being used, often by third parties, including friends of the women. Mr. Wiederhold does not deny that he was present in those situations or that he went along. What matters is that the record does not support a narrative of recruitment through substances orchestrated by Mr. Wiederhold.

Mr. Wiederhold acknowledges that in a limited number of instances he went along with what Pratt was saying or doing. He does not dispute that. He accepts responsibility for failing to object. What he did not understand at the time was the significance of what was being said, or the scope of the harm that would later result. He understood himself to be following the directions of his boss in a controlled environment where he lacked control and leverage.

This distinction is borne out by the investigation. When victims were asked directly who explained where videos would go, who described distribution, and who made assurances, they identified Pratt. Mr. Wiederhold's name appears only after leading or generalized follow-up questions by case agents, often framed in terms of whether Mr. Wiederhold "went along" or did not contradict what Pratt said. As

detailed in the PSR objections, not a single victim affirmatively identified Mr. Wiederhold as the person who made representations about distribution. The FD-302s frequently blur this distinction, overstating Mr. Wiederhold's role in ways that are not supported by the recordings themselves.

Critically, Mr. Wiederhold's involvement must be understood in temporal context. He did not jump into boiling water. He entered early, at a time when the operation had not yet become the fully formed GirlsDoPorn enterprise later charged by the government. What he encountered initially was not the machine that ultimately caused such widespread harm. The deception, control, and exploitation intensified over time.

Mr. Wiederhold's experience was that of a frog in gradually heating water. The temperature rose incrementally, not all at once. As Pratt's lies accumulated and the true nature of the operation began to emerge, Mr. Wiederhold started to understand what was happening. That realization did not occur in a single moment. It unfolded gradually, through outside contacts and inconsistencies that could no longer be reconciled with what Pratt had been telling him.

The contrast with the other defendants is stark. The other defendants jumped into boiling water knowing exactly how hot it was. They joined or remained once the operation was fully formed and the deception was obvious. Mr. Wiederhold did not. He entered earlier, without full understanding, and once he grasped the reality, he worked to leave.

The government's own actions confirm this distinction. Mr. Wiederhold was not charged as part of the original GirlsDoPorn conspiracy in 2019. He was not charged alongside the defendants who knowingly participated in the fully formed enterprise. Instead, the government waited more than four years after charging the core conspiracy before bringing charges against Mr. Wiederhold, based on conduct that predated the charged conspiracy. That timing reflects what the evidence shows: Mr. Wiederhold's role, knowledge, and conduct were different.

Once Mr. Wiederhold fully appreciated what was occurring, he left. That was no small feat given his dependence on Pratt at the time. No other defendant in this case can say the same.

### D. Accountability Without Erasing Nuance

Mr. Wiederhold is not hiding from his conduct. He acknowledges that what he did was wrong and illegal. He acknowledges that he went along in situations where he should have spoken up. He accepts responsibility for that failure.

What he asks is that the Court sentence him based on what actually happened, not based on hindsight or on conduct attributable to others. This case requires nuance. It requires recognizing the difference between an architect and someone under control, between early involvement and later knowing participation, and between someone who stayed and someone who left.

Those distinctions do not minimize harm. They ensure proportionality. They also explain why credit for time served and home detention is appropriate here, and why treating Mr. Wiederhold as interchangeable with the other defendants would create unwarranted disparity, a point that will be addressed fully under § 3553(a).

## IV.
## THE § 3553(A) FACTORS COMPEL A SENTENCE FAR BELOW THE ADVISORY GUIDELINE RANGE

When the Court applies the statutory factors set forth in 18 U.S.C. § 3553(a) to the record in this case, the advisory Guidelines range significantly overstates Mr. Wiederhold's culpability. It obscures critical distinctions in timing and role, fails to account for the extraordinary passage of time, and does not reflect the person Mr. Wiederhold is today. A Guidelines-driven sentence would be greater than necessary to accomplish the purposes of sentencing.

### A. The Nature and Circumstances of the Offense Require an Individualized Assessment.

There is no minimizing the harm caused by the GirlsDoPorn enterprise. Women were deceived into performing sex acts under false pretenses and suffered serious and lasting harm. For victims of the later, mature enterprise, that harm was

compounded by doxxing, harassment, intimidation, and retaliation carried out by Michael Pratt and others. Hundreds of women were victimized, and the Court should fully acknowledge the gravity of that harm.

Mr. Wiederhold does not dispute this. He is remorseful and accepts responsibility for his role. Nothing in this memorandum seeks to diminish the suffering of the women involved.

But § 3553(a) requires sentencing based on individualized conduct. Mr. Wiederhold's involvement predates the charged conspiracy and occurred before the enterprise developed its scale, reach, and enforcement machinery. His conduct involved five women. Three do not attribute deception, coercion, or assurances to him at all, describing him simply as the male actor present. Two describe him negatively only after follow-up questioning by agents and still identify Michael Pratt as the source of the deception.

The interview recordings do not support a coordinated good cop, bad cop strategy. They reflect a subordinate who failed to object to his superior, not a joint recruiter or decision-maker. Mr. Wiederhold accepts responsibility for that failure, but context matters. Most importantly, once he understood what was happening, he left. That fact alone distinguishes him from defendants who joined later or remained as the harm multiplied.

**B.    The History and Characteristics of Mr. Wiederhold Strongly Mitigate Against Custody.**

Section 3553(a) requires the Court to sentence the person before it. Here, the contrast between who Mr. Wiederhold was fifteen years ago and who he is today could not be clearer.

At the time of the conduct, Mr. Wiederhold was a young man in emotional and financial freefall. He had recently suffered the sudden death of his brother, lost his primary emotional support, and lacked structure and stability. He was broke, professionally uncertain, and vulnerable to the control of Michael Pratt, who dictated not only work but housing, travel, and income. That imbalance shaped his ability to push back or walk away at the time.

The man before the Court today bears no resemblance to that person. For nearly fifteen years, Mr. Wiederhold has lived a law-abiding life. He has not reoffended, has maintained steady work and relationships, and has built a quiet, stable life in Northern Michigan. The character letters uniformly describe him as dependable, compassionate, and deeply remorseful.

This transformation is not recent or aspirational. It is proven by time.

The government's own actions underscore this reality. Mr. Wiederhold was not charged when the principal conspiracy was prosecuted in 2019. He was charged years later based on much older conduct. That delay reflects that he was never viewed as a danger requiring incarceration.

Incarcerating Mr. Wiederhold now would not rehabilitate him, deter him, or protect the public. It would punish a man for who he was long ago, not sentence the person who stands before the Court today.

### C. The Purposes of Sentencing Under § 3553(a)(2) Do Not Support Incarceration in This Case.

Section 3553(a)(2) requires the Court to impose a sentence that reflects just punishment, affords adequate deterrence, protects the public, and promotes rehabilitation. When those purposes are evaluated in light of the extraordinary passage of time in this case and Mr. Wiederhold's demonstrated rehabilitation, incarceration is not warranted.

Courts have repeatedly recognized that lengthy delays between offense conduct and sentencing materially alter the sentencing calculus. In *United States v. Robertson*, 662 F.3d 871 (7th Cir. 2011), the Seventh Circuit emphasized that where the government does not charge defendants until many years have passed, the relevant sentencing factors "looked much different than they might have a decade earlier," and that by the time of sentencing the defendants presented "unusually strong evidence of their self-motivated efforts to rehabilitate themselves." Nearly fifteen years have passed since the conduct at issue here, and the Court now evaluates a defendant whose life bears no resemblance to the person he was at the time.

Delay also substantially weakens the deterrent value of punishment. As Justice Stevens observed, "[t]he deterrent value of any punishment is, of course, related to the promptness with which it is inflicted." *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (Stevens, J., concurring). A custodial sentence imposed decades after the fact carries little deterrent force, particularly where the defendant's post-offense conduct already demonstrates that further deterrence is unnecessary.

Courts have also upheld non-custodial sentences where temporal distance from the offense and evidence of changed circumstances render incarceration unnecessary. In *United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010), the Ninth Circuit affirmed a sentence of probation with home confinement, despite a Guidelines range of 27 to 33 months, in part because by the time of resentencing the offense conduct had occurred nine years earlier and the defendant had left the circumstances that contributed to the offense.

Finally, where a defendant has rebuilt his life over a period approaching the length of delay present here, courts have recognized that incarceration may undermine, rather than advance, rehabilitation. In *United States v. Ray*, 578 F.3d 184 (2d Cir. 2009), the Second Circuit addressed a case in which a defendant was not sentenced until fifteen years after pleading guilty, through no fault of her own. During that time, she had undergone what the court described as complete rehabilitation. The court concluded that removing her from her current life to impose custodial punishment would undermine that rehabilitation.

Taken together, these authorities reflect a consistent principle. Where sentencing occurs many years after the offense and the intervening period demonstrates sustained rehabilitation and a law-abiding life, the core purposes of § 3553(a)(2) are not advanced by incarceration. A prison sentence imposed now would not meaningfully deter, rehabilitate, or protect. It would impose punishment untethered from present reality.

### D. Avoiding Unwarranted Sentencing Disparities Requires a Sentence That Meaningfully Distinguishes Mr. Wiederhold.

Section 3553(a)(6) requires the Court to avoid unwarranted sentencing disparities, but also unwarranted similarity. That principle is critical in this multi-defendant case.

The mature GirlsDoPorn enterprise victimized hundreds of women and employed a coercive enforcement apparatus that included harassment, doxxing, and intimidation. Mr. Wiederhold was not part of that machinery.

His conduct predates the charged conspiracy and involved five women. Three do not attribute deception or assurances to him at all. Two do so only after agent prompting and still identify Michael Pratt as the source of deception.

Alexander Foster provides a particularly powerful comparator. Foster received a twelve-month sentence despite serving as a camera operator for approximately one hundred shoots during the mature phase of the enterprise, when its nature was fully known and widely exposed. He remained with GirlsDoPorn for years after its character was clear.

Foster's conduct also extended beyond filming. He admitted involvement in retaliatory harassment, including participation in the "22 whores and 5 shady lawyers" video, which was intended to intimidate women who had brought civil claims and their attorneys. That conduct was not peripheral. It was part of the machinery that amplified harm and silenced victims.

If such conduct warranted twelve months, treating Mr. Wiederhold, whose involvement was earlier, narrower, and followed by exit, as deserving of a substantially harsher penalty would create precisely the kind of unwarranted disparity § 3553(a)(6) forbids.

The government's charging decisions reinforce this point. Mr. Wiederhold was not charged with the core conspiracy in 2019. He was charged years later based on older conduct. Fairness requires that sentencing reflect those distinctions.

## VI.
## CONCLUSION

Nearly fifteen years have passed since the conduct at issue. In that time, Mr. Wiederhold has lived a law-abiding life, built stability, and demonstrated through years of conduct that he is not the person he was at the time of the offense. He was not charged when the core conspiracy was prosecuted, and the government waited more than four years after that to bring this case. That history matters. It confirms that Mr. Wiederhold has not posed a danger to the public and does not require incapacitation now.

Mr. Wiederhold's conduct also stands apart from the others. He was involved early, before GirlsDoPorn became what it later was, and he left once he understood what was happening. He did not join a mature enterprise, remain after its nature was clear, or profit from its expansion. Section 3553(a) does not allow the Court to treat materially different defendants as interchangeable. A sentence of **twelve months of home confinement**, followed by supervised release, reflects accountability while honoring the record, the passage of time, and the statutory command to impose a sentence no greater than necessary.

Respectfully submitted,

DATED: January 23, 2026

/s/ Patrick M. Griffin
PATRICK M. GRIFFIN
Attorney for Defendant
DOUGLAS JAMES WIEDERHOLD